WILLIAM GODDARD vs. DAVID McINTOSH.

Suffolk.    December 7, 1893. — May 15, 1894.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & BARKER, JJ.

*Personal Injuries — Obvious Risk.*

At the trial of an action for personal injuries, it appeared that the plaintiff was employed in a building in process of erection where, in unloading bricks to be used in its construction, it was the practice for the defendant's teamster to stop his wagon near to the sidewalk in front of the building, and then to place planks with one end resting on the floor of the building and the other end on the floor of the wagon, making a level platform on which a man would stand while the teamster tossed the bricks from the wagon to him, who in turn tossed them to another man inside the building; that the plaintiff was familiar with this method of unloading and piling the bricks; that on the occasion of the accident he saw the teamster drive up, and noticed that he threw the reins loosely over the seat, and did not hitch or put any weight to the horses, or put a block under the wheels; and that the horses, which the defendant's agent was praising to a bystander, were fine horses and were restless, and had not been used to draw a load to that place before, and had two weeks previously been brought from the West and purchased by the defendant at auction. The plaintiff and the teamster placed the planks between the wagon and the building in the manner described, and the plaintiff went upon them and began to receive bricks from the teamster, who stood in the front part of the wagon with his back to the horses, and to toss them to the next man. While so engaged, the plaintiff was thrown down by the starting of the horses. *Held*, that the risk of such an accident was obvious, and that the plaintiff could not hold another responsible for it, when he, appreciating the danger, voluntarily placed himself where he was liable to be injured in consequence of it. KNOWLTON, J. dissenting.

TORT, for personal injuries occasioned to the plaintiff on June 2, 1890, while unloading bricks from the defendant's wagon. Trial in the Superior Court, before *Maynard*, J., who ruled that the action could not be maintained, and directed a verdict for the defendant; and the plaintiff alleged exceptions, in substance as follows.

The plaintiff offered evidence tending to prove that he was employed by one Mack, who was erecting a building in Boston, as a laborer under the direction of Mack's superintendent; that the defendant brought to and delivered at the building a large number of loads of terra-cotta blocks to be used in the construction of the same; that since early in April it was the practice, when such loads were so delivered, for the defendant's

servants to drive up alongside the sidewalk in front of the building, and let each team as it came up stand in that position while the driver tossed the blocks from the wagon to Mack's men, who received them and piled them away in the building; that after the first load had been delivered the men placed planks or timbers so that one end should rest on the floor of the wagon and the other end on the floor of the building, making a level platform or walk from the bottom of the wagon to the first floor of the building, and Mack's men would stand on the planks or timbers, and the man on the plank nearest to the wagon would receive them as the driver tossed them to him, and then he would toss them to the next man, and so they would be passed along till they were delivered into the building; that this practice was continued quite a long while with no trouble or accident until June 2, 1890, when the defendant sent a load of blocks to the building in a wagon drawn by a pair of horses which had not been used to draw a load to that place before, and which had two weeks previously been brought from the West and purchased by the defendant at auction in Boston; that the horses were driven up alongside the sidewalk; that the plaintiff at this time stood on the platform nearest to the wagon and received the blocks from the driver, and in turn tossed them to another of Mack's men nearer the building; that after a few of the blocks had been taken off in that way, the horses suddenly started, throwing the plaintiff and the platform to the sidewalk; that another team was standing in front of the horses, which was driven away just before the accident, and that a large team loaded with iron was passing at the time in the street and making considerable noise; and that a great many teams were constantly passing in the street.

The plaintiff testified that " the teamster drove his team alongside of the curbstone, and threw the reins loosely over the seat. He did not hitch the horses. He did not put any weight to the horses. He did not put any blocks of wood or anything under the wheels. I saw him all the time until he commenced to pass the bricks to me, until I fell. I noticed the horses were fine gray horses. McIntosh's agent was praising them to Mr. Haniford. I noticed they were restless. I call them green horses, runaway horses. They were, sir."

The teamster had his back turned to the horses and the fore part of the wagon. He commenced at the fore part of the wagon to unload, and had unloaded about seventy bricks when the horses started. I was taking a brick this way, as I would be throwing to one of the gentlemen here (illustrating). And when I faced for the other one, the horses started and I was thrown.

On cross-examination, the plaintiff testified, " I knew of my own knowledge at the time that the teamster did not put any blocks or trigs before the wheels; I saw that he did not. I saw that he did not when he first drove up. And after I saw it, I and he put these planks on there, and then I went on there to work. And then the team started and the planks fell, and I was on the plank and fell too. I did not get the planks; McIntosh's teamsters got them. The driver threw the reins across the seat loose, or else he could not throw them on the seat. I was there when McIntosh delivered the first load of brick. I helped unload the load. The planks were used in unloading the first load. I am sure of that. The first two loads the teams did not drive up sidewise to the sidewalk. They drove along; there was no traffic in the street. They backed up endwise, and myself and these other men would go and carry them out; the horses would be out in the street; they did not unload all that way; they unloaded a few that way; when we lightened the team, they backed them up and they put those timbers on themselves; before they had lightened the team, the tail end stood to the sidewalk."

*W. B. Orcutt & E. J. Jenkins,* for the plaintiff.

*D. C. Linscott,* for the defendant.

BARKER, J. The evidence tended to show that the practice was for the teamster to stop the wagon near to the sidewalk in front of the building, while he tossed the terra-cotta blocks or bricks to the men employed in the building. This began in the early part of April, and the accident occurred on the 2d of June. After the first load, and, according to the plaintiff's own testimony, in delivering that load also, planks were placed with one end on the floor of the building and the other end on the floor of the wagon, making a level platform on which the men employed in the building would stand, and the teamster

would toss the bricks from the wagon to the man nearest on the platform, who would receive and toss them to the next, and so on until they were piled in the building. The plaintiff was one of the men employed in the building, and from the first was familiar with the whole method used in unloading and piling the bricks. On the occasion of the accident he saw the teamster drive up, and noticed that he threw the reins loosely over the seat, and that he did not hitch or put any weight to the horses, or put anything under the wheels, and that the horses were fine gray horses, which the defendant's agent was praising to one Haniford, and that they were restless. After he had noticed all this, he and the teamster put on the planks, and he went on to them and began to receive bricks from the teamster and toss them to the next man. The teamster began to unload in the front part of the wagon, and in tossing bricks to the plaintiff stood with his back to the horses. While they were so engaged, and when about seventy of the bricks had been so handled, the plaintiff was thrown by the starting of the horses.

It is plain that the risk of such an accident was obvious, and that it must have been understood and appreciated by the plaintiff. If the practice had not been one with which he was familiar, the situation was one which any one with ordinary faculties and intelligence could not fail to understand and appreciate at a glance. It was apparent that, if the horses should start, the planks on which the plaintiff stood would be displaced, and the plaintiff exposed to a fall. So far as the danger upon that particular occasion was enhanced by the facts that the horses then attached to the wagon were restless, and that they were not hitched or fastened to a weight, but left with the reins thrown loosely over the seat, and that the wheels were not blocked, the plaintiff saw and knew all these things before he and the teamster put on the planks and he went upon them to work. Knowing all these elements of the danger to which he would be exposed, he voluntarily placed himself in the situation of risk, without any inducement on the part of the defendant or of the teamster. He cannot hold the defendant responsible for sending restless horses with the wagon, or for the teamster's omission to hitch or fasten them or to block the wheels, or his throwing the reins loosely over the seat, because, knowing and appreciating

all those things before he was himself exposed to any danger in consequence of them, he then voluntarily placed himself where he was liable to injury in consequence of them.

In the opinion of a majority of the court, the order must be

*Exceptions overruled.*

KNOWLTON, J. I do not agree with the majority of the court in their view of this case.

On the question whether a plaintiff has a right to go to the jury, he is entitled to that interpretation of the evidence which is the most favorable possible to his claim. From the evidence reported in this case a jury might have found, on their common knowledge, that the horses ordinarily used in drawing bricks and other heavy loads in Boston are so trained and accustomed to their work that nobody deems it necessary to hitch them while occupied on or about the wagon in loading or unloading. The plaintiff was engaged in his usual way in the business in which he had daily worked in safety for about two months. There was evidence introduced by the defendant that this was the usual method of conducting the business of delivering freight at buildings in Boston. *Maynard* v. *Buck*, 100 Mass. 40. The jury properly might have found that, if the horses had been such as are commonly used in this kind of business, and such as the plaintiff supposed them to be, he would not have been hurt.

The plaintiff had never seen the horses until just before the accident. They had been brought to Boston from the West a few days before and sold at auction, and on this occasion they were driven to the building for the first time. From the evidence the jury might well have believed that they were spirited young horses, fresh from the prairies of the West, unaccustomed to the sights and sounds of towns or cities, and without training for such work as they were doing. In these facts alone lay the plaintiff's danger. These facts the defendant and his driver knew, or might have known. The plaintiff knew nothing of them. He had never seen or heard of the horses before. He testified to his opinion of them at the time of the trial, derived from their running away on the day of the accident, and from what he heard of them afterwards. As a part of his work at the

building he was called upon to help in unloading the wagon, and there is no evidence that he noticed the horses particularly before he took his position on the planks to receive the bricks. About seventy bricks had been taken out before the accident. The reins were thrown over the driver's seat and the driver was working in the forward part of the wagon near the seat. At some time the plaintiff noticed that " they were fine gray horses." The defendant's " agent was praising them to Mr. Haniford." But in the evidence we find no hint or suggestion that the plaintiff had any reason to suppose that they were not safe and suitable for their place except in the sentence, " I noticed they were restless." It does not appear that this restlessness continued more than a moment, or that it was considerable in degree. Certainly, according to the bill of exceptions, it was not enough to attract the attention of the driver, who was working on the wagon near the seat where the reins were. The plaintiff had a right to trust somewhat to the conduct of the driver, who was supposed to know what kind of horses he had. If he had known the history or the nature of the horses, he might well have thought his position unsafe; but the jury might properly have found that there was nothing which should lead him to think he could not safely unload the wagon in the same way as persons commonly unload such wagons drawn by other horses. It will hardly be said that his failure to get down and discontinue his work at the least appearance of restlessness of a pair of draft horses attached to a heavy load was such generally recognized carelessness as to justify the court in dealing with it judicially, and saying that it presents no question of fact for the consideration of a jury.

The rules in regard to the assumption of the risk growing out of the implied contract between master and servant do not apply to this case, for the plaintiff was not in the defendant's service, and there was no relation of contract, express or implied, between them. But applying the doctrine of the assumption of the risk in the broadest way, I do not see how it can be said, as matter of law, in any case, that one injured by a defendant's negligence is precluded from recovery on the ground that he assumed the risk of the injury, when it appears that, without fault, he was ignorant of the danger, and of the principal facts and conditions

from which the danger arose. As I understand the decisions, before he can be so precluded it must appear beyond the possibility of a finding to the contrary that he understood and appreciated the danger. *Fitzgerald* v. *Connecticut River Paper Co.* 155 Mass. 155. *Smith* v. *Baker*, [1891] A. C. 325.